UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LIBERTY MUTUAL FIRE INSURANCE
COMPANY,

                                        Plaintiff,

                   -against-

JDS CONSTRUCTION GROUP LLC, et al.,

                                        Defendants.

---

Case No. 1:21-cv-01931 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Plaintiff Liberty Mutual Fire Insurance Company ("Plaintiff" or "Liberty Mutual") brings this action against JDS Construction Group LLC, JDS Construction Services LLC, 111 West 57th Developer LLC, PMG West 57th Street LLC, and 111 Construction Manager LLC (together, "Defendants") seeking specific performance of an agreement entered into between the parties requiring Defendants to deposit money into a pre-funded deductible program that would bring the required balance up to $16,963,132, as well as attorneys' fees and costs.  *See* ECF No. 44 ("Compl.").  Defendants assert a counterclaim that Plaintiff breached the agreement by miscalculating that balance.  *See* ECF No. 57 ("Ans.").  Now before the Court are the parties' cross-motions for summary judgment.  Specifically, Plaintiff contends that it is entitled to judgment as a matter of law because the terms of its agreement with Defendants provide for its requested relief, and Defendants have not properly alleged a breach of contract.  *See* ECF Nos. 113 ("Pl. Br."), 128 ("Pl. Reply"), 121 ("Pl. Opp.").[1]  Defendants oppose this motion and

---

[1] In support of its motion, Plaintiff also submitted the following: a Rule 56.1 statement (ECF No. 114 ("Pl. 56.1")); a declaration from Lee Sher, and accompanying exhibits (ECF No. 115 ("Sher Decl.")); a declaration from Marshall T. Potashner, and accompanying exhibits (ECF No. 116 ("Potashner Decl.")); a reply declaration from Marshall T. Potashner (ECF No. 126 ("Potashner Reply Decl.")); and a response to Defendants' Rule 56.1 statement of additional facts (ECF No.

separately have made their own motion for summary judgment, arguing that Plaintiff is
foreclosed from seeking specific performance here.  *See* ECF Nos. 123 ("Df. Opp."), 118 ("Df.
Br."), 127 ("Df. Reply").[2]  For the reasons set forth below, Defendants' motion is DENIED and
Plaintiff's motion is GRANTED.

## BACKGROUND

Unless otherwise noted, the following facts are undisputed.  As part of a project involving
the construction of one of the tallest residential buildings in New York City, located at 105-111
West 57th Street, Defendants purchased a large deductible Contractors Controlled Insurance
Program ("JDS Construction CCIP" or "CCIP") from Plaintiff.  Df. 56.1 Counter ¶¶ 1-2.  Under
that CCIP, Plaintiff provided Workers Compensation and Employers Liability ("WC") coverage,
as well as Commercial General Liability ("CGL") coverage related to the construction project.
*Id.* ¶ 3.  On August 25, 2014, Plaintiff and Defendants entered into the Workers Compensation
and Employers Liability Insurance Policy ("WC Policy"), identified as Liberty Mutual Policy
No. WA2-62D-094668-014.  Pl. 56.1 Counter ¶ 1; Df. 56.1 Counter ¶ 14 (undisputed that policy
was extended to January 10, 2021); *see also* ECF Nos. 115-2, 115-3, 115-4 ("WC Policies").
The WC Policies were subject to a deductible amount of $750,000 for each occurrence of bodily
injury by accident and for each claim of bodily injury by disease.  Df. 56.1 Counter ¶ 17.  On or
about that same day, Plaintiff and Defendants entered into a Commercial General Liability

129 ("Pl. 56.1 Addit. Counter")).  In opposition to Defendants' motion, Plaintiff also submitted a
counterstatement to Defendants' Rule 56.1 Statement (ECF No. 122 ("Pl. 56.1 Counter")).

[2] In support of their motion, Defendants also submitted the following: a Rule 56.1 Statement
(ECF No. 120 ("Df. 56.1")); and a declaration from Andrew N. Bourne, and accompanying
exhibits (ECF No. 119 ("Bourne Decl.")).  In opposition to Plaintiff's motion, Defendants also
submitted: a counterstatement to Plaintiff's 56.1 statement (ECF No. 125 ("Df. 56.1 Counter));
and another declaration from Andrew N. Bourne, and accompanying exhibits (ECF No. 124
("Bourne Opp. Decl.")).

Insurance Policy ("CGL Policy"), identified as Liberty Mutual Policy No. TB2-621-094668-024. Pl. 56.1 Counter ¶ 2; *see also* ECF No. 115-1 ("CGL Policy," and together with the WC Policies, "Deductible Policies").  The CGL Policy was subject to a deductible amount of $3,000,000 per occurrence.  Pl. 56.1 Addit. Counter ¶ 89.

At the same time that the original policies were issued, Plaintiff and Defendants entered into a "Pledge and Security Agreement For Guarantee Of Deductibles and/or Loss Limit Reimbursement #8344" (the "Pledge Agreement") in order "to secure payment of [Defendants'] deductible obligations."  Df. 56.1 Counter ¶ 20; *see also* ECF No. 115-5 ("Pledge Agreement"). The Pledge Agreement states that the agreement is made "to secure all of Policyholder's obligations to Liberty Mutual arising out of or in connection with (i) any and all the insurance policies listed below; (ii) any and all renewals, rewrites thereof and (iii) any policies which are written by Liberty Mutual for Policyholder during the term of this Agreement."  Pledge Agreement at 1.[3]  The Deductible Policies are the "insurance policies" identified in this section. Df. 56.1 Counter ¶ 22.  The Pledge Agreement further provides that "[t]he amount owed by Policyholder for deductible and/or loss amounts paid or advanced by Liberty Mutual pursuant to the Insurance Policies, shall be debited monthly by Liberty Mutual from the Pre-Funded Deductible Program described in [§] 6(a) below."  Pledge Agreement § 5.  Pursuant to that system, "Policyholder acknowledges and agrees that debits . . . constitute either reimbursement for amounts advanced by Liberty Mutual that are the sole and exclusive liability of the Policyholder, or payment for other obligations due from Policyholder to Liberty Mutual."  *Id.*

---

[3] As defined in the Pledge Agreement, the Policyholder is JDS Construction CCIP and all of the "named insureds" on the Deductible Policies, which include all Defendants.  *See* Pledge Agreement § 2; Df. 56.1 Counter ¶¶ 13, 15-16.

Under Section 6 of the Pledge Agreement, in order "[t]o secure the Obligations, whether now existing or hereafter arising, . . . in connection with the Insurance Policies, . . . Policyholder hereby pledges to and grants a security interest to Liberty Mutual" in the policyholder's money and property (and proceeds) "which is now in or which shall hereafter come into the possession, custody or control" of Plaintiff, "including but not limited to cash reflected by a bookkeeping entry maintained by" Plaintiff, which is called the "Pre-Funded Deductible Program." *Id.* § 6. Defendants agreed to maintain a "Required Balance" in that Program, which is referred to in the Agreement as Plaintiff's "estimate of the dollar amount of unpaid claims for which Policyholder may potentially be liable . . . as listed on the attached schedule." *Id.* § 7; *see* Pl. 56.1 Addit. Counter ¶ 93. Per the schedule in the Pledge Agreement, Defendants provided $16,500,000 to Plaintiff, paid in installments of $2,062,500 over the course of roughly 18 months. *See* Pledge Agreement § 7; Pl. 56.1 Addit. Counter ¶ 94. Defendants agree that they have not paid any additional security to Plaintiff beyond the initial $16,500,000. Df. 56.1 Counter ¶ 63. The Agreement also provides that Plaintiff would "recalculate the Required Balance to be held in the Pre-Funded Deductible Program and review the type of security being held as of: (i) the recalculation dates indicated in [§] 8; (ii) any date that the actual balance held in the Pre-Funded Deductible Program falls below the minimum balance indicated on the most recent Schedule and (iii) on such dates as [Plaintiff] may determine in its sole and absolute discretion." Pledge Agreement § 7. When Plaintiff recalculated the Required Balance, it would issue an updated schedule to Defendants, and if the number provided on that schedule was "greater than the amount then held in the Pre-Funded Deductible Program," Defendants were required to "deposit additional cash" into the Program within 30 days. *Id.* Should they fail to do so, Plaintiff was entitled to late fees. *See id.*

The Pledge Agreement also sets forth the method by which Plaintiff could recalculate the Required Balance:

> [f]or purposes of this Agreement, the Required Balance shall equal the incurred ratable losses developed using the development factors below subject to the deductible aggregate or maximum (if applicable) minus the paid ratable losses.  If the date of recalculation is not a date scheduled below, the loss development factor listed for the next scheduled recalculation date following the date of recalculation will be used to develop incurred ratable losses.

*Id.* § 8.  The Agreement does not define the term "incurred ratable losses."  However, the Agreement does define the term "ratable losses," as "allocated loss adjustment expenses and all loss amounts [Plaintiff] pays pursuant to the terms of the Insurance Policies plus all amounts that [Plaintiff], in its sole and absolute discretion, estimates that [it] will pay for losses within the applicable 'Retention' shown in the Large Risk Alternative Rating Option attached to the Insurance Policies."  *Id.*  The Pledge Agreement then lists loss development factors for the 2014 Policy Period.  *Id.*  After that, the parties agree that the factors are based on actuarial formulas to address claims that may occur in the future or have otherwise not been reported to Plaintiff.  Df. 56.1 Counter ¶ 28.  Moreover, the Agreement provides that, Plaintiff "will review the Pre-Funded Deductible Program periodically and may amend the required balance, minimum, or type of security using customary business practices, notwithstanding the schedule."  Pledge Agreement § 8.  The parties dispute the meaning of "incurred ratable losses" (indeed, it is the primary issue in this litigation), and in light of that dispute, whether Plaintiff properly calculated the Required Balance.

Elizabeth Lowe signed the Pledge Agreement on behalf of Defendants.  Df. 56.1 Counter ¶ 35.  She subsequently executed a "Financial Terms and Conditions" document "to confirm"

Defendants' "understanding and agreement to the deductible and premiums agreements associated with the Deductible Policies." *Id.* ¶ 47.  That document provides the following:

> You have chosen to participate in our Pre-Funded Deductible Program ("Program") as described herein.  To secure deductible loss reimbursement and/ or premium payment and all other financial obligations arising under the policy you must advance cash funds to be held by us.  We shall make a bookkeeping entry reflecting your ownership of the funds held pursuant to the Pre-Funded Deductible Program.  In connection with the foregoing, you acknowledge and agree that amounts credited to you as part of the Pre-Funded Deductible Program need not be segregated from other assets of Liberty Mutual and that no interest or other income shall be paid or credited to the Policyholder on such funds.
>
> The amount of funding required for participation in the Pre-Funded Deductible Program is calculated using the estimated unpaid claims which are your responsibility.  We will adjust the required balance of the Pre-Funded Deductible Program using losses valued as of the dates below using the Loss Development Factor indicated.  The required balance of the Pre-Funded Deductible Account at each of the Adjustment Dates below will be equal to the Incurred Ratable Losses multiplied by the Loss Development Factor, minus the Paid Ratable Losses.

ECF No. 115-6 at 2 ("Financial Terms & Conditions"); *see also* ECF No. 115-8 ("Amended Financial Terms & Conditions").[4]  The Pledge Agreement contemplates this document, by providing that "[i]n the event of a conflict between the terms set forth in the Financial Terms & Conditions executed by Policyholder and those set forth in this Agreement the terms set forth in this Agreement shall prevail."  Pledge Agreement, App. A at 11.

The parties also entered into a Large Risk Alternative Rating Option Endorsement Premium Determination Endorsement, which they amended twice.  Df. 56.1 Counter ¶¶ 49, 55-

---

[4] While Defendants do not dispute that the Amended Financial Terms & Conditions document was signed by Michael Stern, the owner of Defendant JDS Construction Group, LLC, Defendants contend that this document does not reflect the parties' intentions.  *See* Df. 56.1 Counter ¶ 52.

56; ECF Nos. 115-7 ("First LRARO"), 115-9 ("Second LRARO"), 115-10 ("Third LRARO"), 115-11 ("Fourth LRARO"). Each of those agreements provide for a different "Maximum Retained Loss." In the First LRARO, the "Maximum Retained Loss is based upon a rate per 100 WC Payroll [of] 35.0798 but not less than 16,500,000." First LRARO at 1. In the Second LRARO, the "Maximum Retained Loss is based upon a rate per 100 WC Payroll of 35.0798 but not less than 18,500,000." Second LRARO at 1. And in the Third and Fourth LRAROs, the "Maximum Retained Loss is based upon a rate per 100 WC Payroll of 35.0798 but not less than 21,000,000." Third LRARO at 1; Fourth LRARO at 1. Plaintiff contends that, per the extension of the Deductible Policies, Defendants were required to put an additional $2 million of cash collateral in the Program. *See* Df. 56.1 Counter ¶ 64. Defendants dispute that this agreement was ever made. *Id.*

In any event, in November 2020, the cash collateral account contained $13,446,226. *Id.* ¶ 69. Plaintiff purportedly recalculated the Required Balance to be held in the Pre-Funded Deductible Program by sending Defendants an updated schedule reflecting a Required Balance of $16,963,132. *Id.* ¶¶ 67-68. Defendants admit that Plaintiff sent them this schedule, but dispute that the Required Balance was accurately recalculated. *See id.* In particular, Defendants contend that Plaintiff improperly included estimates of losses in their definition of "incurred ratable losses," inflating the Required Balance. *See id.* In November and December 2021, when the amount in the Program was $9,518,024.82, Plaintiff again recalculated the Required Balance, this time to $14,228,948.91. *Id.* ¶¶ 71-75; *see also* ECF No. 115-13 ("Jan. 2022 Schedule"). Defendants again dispute this recalculation. Df. 56.1 Counter ¶ 74. As of September 13, 2022, the amount of cash collateral in the Pre-Funded Deductible Program was $4,728,175.03. *Id.* ¶ 76. The Deductible Policies expired on January 10, 2021. *Id.* ¶ 83.

Plaintiff filed this action, seeking specific performance by Defendants to place more cash "into the Pre-Funded Deductible Program to bring the collateral balance up to the Required Balance of $16,963,132." Compl. at 15. Defendants deny the allegations in the Complaint, and assert a counterclaim contending that Plaintiff breached the Pledge Agreement by seeking a higher Required Balance than permitted under the contract. *See* Ans. at 14-15. On November 21, 2022, Plaintiff filed its motion for summary judgment seeking the alleged shortfall in collateral up to a newly recalculated balance of $14,228,948.91. *See* Pl. Br. On December 1, 2022, Defendants filed their motion for summary judgment opposing Plaintiff's entitlement to specific performance. *See* Df. Br. Plaintiff filed its opposition to Defendants' motion on January 6, 2023, *see* Pl. Opp., and Defendants filed their opposition to Plaintiff's motion on January 9, 2023, *see* Df. Opp. Both parties filed their replies on January 30, 2023. *See* Pl. Reply; Df. Reply.[5] The motions are thus fully submitted to the Court.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a moving party is entitled to summary judgment if, on any claim or defense, that party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute is one in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Id*. Thus, "the substantive law will identify which facts are material." *Id.*

---

[5] Defendants requested oral argument on the motions. *See* ECF No. 130. However, in the exercise of its discretion, the Court denies that motion as oral argument would not be helpful to the Court. *See AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 226 (2d Cir. 1999) (noting that "a district court's decision whether to permit oral argument rests within its discretion" (internal citation omitted)).

At summary judgment, the court's task is simply to "discern[] whether there are any genuine issues of material fact to be tried, not to decid[e] them." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Therefore, "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997). The court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Est. of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016) (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).

## DISCUSSION

The Court considers each motion for summary judgment independently and will resolve all ambiguities against the nonmoving party. Nevertheless, because the parties' motions somewhat overlap, the Court will address each claim and defense, and the parties' arguments with respect to them, rather than address each motion separately.

### I.   Specific Performance

Plaintiff seeks summary judgment on its claim for specific performance. Defendants argue that Plaintiff's claim must be dismissed because Plaintiff is not entitled to specific performance, the relief sought in the Complaint. *See* Df. Br. at 6-9. They argue that Plaintiff cannot show that its remedies at law are incomplete or otherwise inadequate, because money damages are available. *See id.* at 8-9. Plaintiff argues that specific performance is the appropriate remedy here because it is seeking funding for a collateral security obligation. *See* Pl. Opp. at 6-14. The Court agrees with Plaintiff.

9

As a threshold matter, the parties agree that the Court may apply New York law to the question of whether Plaintiff is entitled to specific performance as a remedy under these circumstances. *See* Df. Br. at 7-8 & n.1 (arguing that New York law should apply); Pl. Opp. at 3 n.2 (noting that New York law and Massachusetts law "are in accord" on the remedy dispute).

To be entitled to specific performance of a contract, a plaintiff must demonstrate that: "(1) a valid contract exists between the parties, (2) the plaintiff has substantially performed its part of the contract, and (3) [the] plaintiff and defendant are each able to continue performing their parts of the agreement." *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 433 (2d Cir. 1993). A party seeking specific performance must also show "equitable factors in its favor, for example, the lack of an adequate remedy at law, and must also demonstrate that its risk of injury, if the injunction is denied, is one that after balancing the equities entitles it to relief." *Id.*; *see also NML Cap., Ltd. v. Republic of Argentina*, 699 F.3d 246, 261 (2d Cir. 2012) (noting that the court may not order specific performance unless "no adequate monetary remedy is available" and "relief is favored by the balance of equities, which may include the public interest"). "One of the factors balanced is irreparable harm . . . ." *Nemer Jeep-Eagle, Inc.*, 992 F.2d at 433.

The parties do not dispute anywhere in their papers that they have a valid contract between them, that Plaintiff has performed under the contract, and that both parties can continue to perform under the contract. *See generally* Df. Br.; Pl. Opp. Rather, the parties dispute whether there is irreparable harm and whether equitable factors prevent the ordering of specific performance because Plaintiff, according to Defendants, has an adequate remedy at law: money damages for the particular amount sought. *See* Df. Br. at 8-9. To be sure, Plaintiff's Complaint seeks a specific sum of money to be deposited into the Pre-Funded Deductible Program. *See*

Compl. at 14-15.  However, Plaintiff is seeking more than monetary damages.  Plaintiff requests a judgment "declaring and determining" that it is "entitled to specific performance of the Pledge Agreement" and also "ordering [D]efendants to deposit additional cash collateral . . . into the Pre-Funded Deductible Program to bring the collateral balance up to the Required Balance[.]" *Id.*

That Program is explained in the Pledge Agreement at the heart of this dispute.  The terms of Pledge Agreement provide that, in order "[t]o secure the Obligations, whether now existing or hereafter arising, . . . Policyholder hereby pledges to and grants a security interest to Liberty Mutual" in the policyholder's money and property (and their proceeds) "which is now in or which shall hereafter come into the possession, custody or control" of Plaintiff, "including but not limited to cash reflected by a bookkeeping entry maintained by" Plaintiff, which is called the "Pre-Funded Deductible Program."  Pledge Agreement § 6.  Plaintiff would then "debit[]" from that Program "deductible and/or loss amounts," and otherwise use it to pay Defendants' obligations.  *Id.* § 5.  However, if at any time, the Required Balance was *lower* than the amount of collateral in the Program, Defendants could "request that any excess cash be returned."  *Id.* § 7.  While the parties dispute the calculations for the Required Balance, they do not dispute, as the terms of this agreement provide, that Plaintiff had a right to "amend" the balance.  *See id.* § 8.  Moreover, the terms make clear that Plaintiff otherwise bargained for, and received, a "security interest" in certain "collateral;" in turn Defendants accepted a "duty to maintain cash in the Pre-Funded Deductible Program" until all obligations were fulfilled.  *See id.* § 7.

This agreement is similar to surety contracts, which also involve collateral security. "Several courts, both in this circuit and in other circuits, have recognized that the defendants' obligation to provide [a surety] with collateral security is subject to enforcement by specific

performance because the damage resulting from the failure to give security is not ascertainable, and the legal remedy is therefore inadequate." *Ohio Cas. Ins. Co. v. Fratarcangelo*, 7 F. Supp. 3d 206, 214 (D. Conn. 2014) (internal alterations adopted and quotation marks omitted) (collecting cases). In a contract involving collateral security, "[i]f a creditor is to have the security position for which he bargained, the promise to maintain the security must be specifically enforced." *Marine Midland Tr. Co. of N.Y. v. Alleghany Corp.*, 28 F. Supp. 680, 683-84 (S.D.N.Y. 1939); *see Ohio Cas. Inc. Co.*, 7 F. Supp. 3d at 214 (quoting *Safeco Ins. Co. of Am. v. Schwab*, 739 F.2d 431, 433 (9th Cir. 1984)); *see also U.S. Fid. & Guar. Co. v. J. United Elec. Contracting Corp.*, 62 F. Supp. 2d 915, 922 (E.D.N.Y. 1999) ("Courts in New York have routinely upheld the validity of collateral security clauses and enforced their terms.").

In *Safeco Insurance Co. of America v. Hirani/MES, JV*, for example, the Second Circuit considered indemnity agreements under which the defendants had agreed to provide the plaintiff, an insurance company, with "enough collateral security to 'discharge any claim made against [Safeco]' and to 'cover all exposure under . . . [the] bonds.'" 480 F. App'x 606, 608 (2d Cir. 2012) (omission and alterations in original). The terms of the plan provided that the defendants "were required to provide collateral security upon demand if Safeco became exposed to potential losses and expenses." *Id.* The Second Circuit observed that, when a party has "bargained for collateral security and . . . failed to receive it," that party's "injury is real and immediate," entitling the party to specific performance. *Id.* (quoting *Am. Motorists Ins. Co. v. United Furnace Co.*, 876 F.2d 293, 302 (2d Cir. 1989)).

Despite the fact that the terms of the Pledge Agreement, like those in the indemnification agreements in *Safeco*, required Defendants to provide collateral security, Defendants maintain that the Required Balance under the Pledge Agreement is not akin to a surety or indemnification

contract, because "the Pledge Agreement set out Defendants' total potential liability at the outset

of the Parties' relationship at a maximum aggregate of $16,500,000" and later at "$21,000,000."

Df. Reply at 4.  It is not clear to the Court how an agreed-upon "maximum potential liability"

under this Pledge Agreement (assuming Defendants correctly characterize these numbers)

differentiates this agreement from other agreements to provide collateral security.  To be sure,

Plaintiff seeks a specific sum of money in this action, and there may be a known cap on ultimate

liability, but the Pledge Agreement contemplates that Plaintiff has a bargained-for right to

collateral prior to payment on any claims that Defendants may ultimately bring.  Specifically, the

Pledge Agreement states that Plaintiff "will recalculate the Required Balance to be held in the

Pre-Funded Deductible Program . . . on such dates as Liberty Mutual may determine in its sole

and absolute discretion."  Pledge Agreement § 7.  Under the terms, Plaintiff could also

"periodically . . . amend the required balance, minimum, or type of security . . . notwithstanding

the schedule."  *Id.* § 8.  Defendants clearly agreed to "deposit additional cash into the Pre-

Funded Deductible Program so that the amount in such Pre-Funded Deductible Program equals

the Required Balance."  *Id.* § 7.  Under these terms, Plaintiff has a bargained-for right to

collateral (even if the amount is specified) – a right that means that monetary damages are not

"an adequate remedy at law," and that there is irreparable harm if Plaintiff is subject to the risk

attendant to the lack of bargained-for collateral.  *Nemer Jeep-Eagle, Inc.*, 992 F.2d at 433; *see*

*BIB Const. Co. v. Fireman's Ins. Co. of Newark*, 625 N.Y.S.2d 550, 552 (1st Dep't 1995)

(requiring specific cash amount to be deposited as a reserve because "[t]he obligation to make

the deposit is subject to enforcement by specific performance: The damage resulting from the

failure to give security is not ascertainable, and the legal remedy is therefore inadequate."

(internal quotation marks omitted)).  The Court therefore denies Defendants' motion for summary judgment contesting Plaintiff's right to seek specific performance.

## II. Entitlement to Additional Cash Collateral Under Terms of Pledge Agreement

The closer question in this case is what amount of collateral security, if any, Defendants must deposit in the Pre-Funded Deductible Program.  *See Safeco*, 480 F. App'x at 609 (determining amount of collateral security that the defendants were required to provide).  Plaintiff argues that it is entitled to summary judgment on its claim for specific performance and, in turn, an order that Defendants must deposit additional cash collateral into the Pre-Funded Deductible Program that would meet the Required Balance calculated as $14,228,948.91, as of January 6, 2022.  *See* Pl. Br. at 21; Df. 56.1 Counter ¶¶ 71-75; ECF No. 115-13 ("Jan. 2022 Schedule").  The Required Balance, according to Plaintiff, is determined by taking "incurred ratable losses," multiplying it by a "loss development factor," and then subtracting "paid ratable losses," or losses already paid on claims.  *See* Pl. Br. at 2, 8, 21; *see also* Pledge Agreement §§ 7-8.  The parties do not dispute this formula.  Instead, the definition of "incurred ratable losses" (and thus, the Required Balance that results from application of the formula that incorporates it) is the subject of vigorous dispute between the parties.

Under Massachusetts law,[6] to establish a breach of a contractual provision, "the plaintiff must prove that a valid, binding contract existed, the defendant breached the terms of the

---

[6] Plaintiff frequently relies on caselaw from New York in support of its arguments regarding the construction of terms in the Pledge Agreement.  *See, e.g.*, Pl. Br. at 11-12 (citing various New York cases).  As Defendants point out, however, under the explicit terms of the Pledge Agreement, Massachusetts law governs its construction.  *See* Df. Opp. at 11; *see also* Pledge Agreement, App. A at 11 ("This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.").  Plaintiff, in its reply brief, appears to admit this error.  *See* Pl. Reply at 8 (pointing out that New York statutes and Massachusetts statutes are similar).  Therefore, the Court construes the Pledge Agreement, as the contract dictates, in accordance with the law of Massachusetts.

contract, and the plaintiff sustained damages as a result of the breach." *Young v. Wells Fargo Bank, N.A.*, 828 F.3d 26, 32 (1st Cir. 2016) (internal citation omitted). "A court interpreting a contract must first assess whether the contract is ambiguous." *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 783 (1st Cir. 2011). "To answer the ambiguity question, the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties." *Bank v. Thermo Elemental Inc.*, 888 N.E.2d 897, 907 (Mass. 2008). "A contract is ambiguous either where its 'terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken.'" *Minturn v. Monrad*, 64 F.4th 9, 14 (1st Cir. 2023) (quoting *Farmers Ins. Exch.*, 632 F.3d at 783); *see also Bank*, 888 N.E.2d at 907. In determining whether a contractual provision is ambiguous, "the court must interpret the contract to effectuate the parties' discerned intent, which 'must be gathered from a fair construction of the contract as a whole.'" *Minturn*, 64 F.4th at 14 (quoting *VFC Partners 26, LLC v. Cadlerocks Centennial Drive, LLC*, 735 F.3d 25, 29 (1st Cir. 2013)). "Words that are 'plain and free from ambiguity' must be understood in their 'usual and ordinary sense,' and a contract should be interpreted 'in a reasonable and practical way, consistent with its language, background, and purpose.'" *Gen. Hosp. Corp. v. Esoterix Genetic Lab'ys, LLC*, 16 F.4th 304, 308 (1st Cir. 2021) (quoting *Bukuras v. Mueller Grp., LLC*, 592 F.3d 255, 262 (1st Cir. 2010)). If a court determines that a contractual provision is ambiguous, "contract meaning normally becomes a matter for the factfinder, and summary judgment is appropriate only if the extrinsic evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide to the contrary." *Farmers Ins. Exch.*, 632 F.3d at 784.

Plaintiff contends that "incurred ratable losses" consist of "monies paid or reserved on known claims reported to" Plaintiff, as limited by the deductible obligations.  Pl. Br. at 2. Plaintiff argues that, in light of the clear purpose of the Pledge Agreement and its unambiguous terms, "incurred ratable losses" refer to "the total of the amount paid on the claims and the total of the *reserves placed on claims reported* to [Plaintiff]."  *Id.* at 8 (emphasis added); *see also id.* at 21 ("The clear and unambiguous meaning of 'incurred ratable losses' means amounts paid on claims plus amounts estimated to be paid on claims, to wit, reserves, by the insurance company, limited to the Named Insureds' potential deductible obligations.").  In support of this interpretation, Plaintiff makes several arguments.  First, it argues that any interpretation of the phrase "incurred ratable losses" that does not include reserves would make the phrase impermissibly synonymous with "paid ratable losses."  Pl. Br. at 14.  Second, Plaintiff contends that, per the Financial Terms and Conditions document, which the parties executed roughly two months after the Pledge Agreement but which was effective for the coverage period, the parties' intent is clear: "[t]he amount of funding required for participation in the Pre-Funded Deductible Program is calculated using the estimated unpaid claims which are [Defendants'] responsibility." Financial Terms & Conditions at 2; *see* Pl. Br. at 14, 16.  Third, Plaintiff argues that insurance law supports its definition.  *See* Pl. Br. at 15.  Finally, Plaintiff says that, if the Court determines that the phrase "incurred ratable losses" is ambiguous, all extrinsic evidence supports Plaintiff's interpretation.  *See id.* at 16-22.

Defendants dispute Plaintiff's definition of "incurred ratable losses," and argue that Plaintiff's interpretation of the phrase conflates the term "incurred ratable losses," with "ratable losses," which are explicitly defined in the Pledge Agreement as: "allocated loss adjustment expenses and all loss amounts [Plaintiff] pays pursuant to the terms of the Insurance Policies plus

all amounts that [Plaintiff], in its sole and absolute discretion, estimates that [it] will pay for losses within the applicable 'Retention' shown in the Large Risk Alternative Rating Option attached to the Insurance Policies." Pledge Agreement § 8; *see* Df. Opp. at 2. In Defendants' view, "incurred ratable losses" must be "the subset of ratable losses that have been paid out or *established with specificity*, but not yet paid." Df. Opp. at 2 (emphasis added). They also describe their proposed interpretation of the term as "those [ratable losses] that are known, but not yet paid," and as a "loss that [has] actually been incurred and paid out, or a liability that [has] actually been established with finality." *Id.* at 16-17 (internal citation omitted). In support of their interpretation, Defendants argue that their proposal gives meaning to the word "incurred," unlike Plaintiff's interpretation. *See id.* at 15-16. They argue that the plain meaning of "incurred" is "to become liable or subject to," *see id.* at 17 (citing Merriam-Webster.com), and thus "incurred ratable losses" are those "known with finality," *id.* Defendants assert that if a loss is not known with finality, it is not "incurred" because it is "not something for which Defendants are 'liable or subject to.'" *Id.* In response to Plaintiff's arguments, Defendants contend that the Court cannot rely on the Financial Terms and Conditions because it is a separate contract, and that the Pledge Agreement provides that "[i]n the event of a conflict between the terms set forth in the Financial Terms and Conditions executed by Policyholder and those set forth in this Agreement[,] the terms set forth in this Agreement shall prevail." *Id.* (quoting Pledge Agreement, App. A at 11). They also contend that, at the very least, the phrase is ambiguous and the extrinsic evidence inconclusive, requiring this dispute to go to a jury. *See id.* at 18-23.

At bottom, both parties agree that the definition of "incurred ratable losses" includes losses that have been paid. *See* Pl. Br. at 2; Df. Opp. at 15. They disagree, however, as to what else falls within the definition: Plaintiff's definition includes "reserves," or estimates of future

payments based on known claims that have been reported to Plaintiff, while Defendants'

definition includes only losses for claims that have been "established with specificity" or finality.

*See* Pl. Br. at 2, 8, 21; Df. Opp. at 1, 16-17.

To determine the unambiguous meaning of the phrase "incurred ratable losses" or resolve

whether it is ambiguous, the Court first looks to the text of the Pledge Agreement itself. *See*

*Balles v. Babcock Power Inc.*, 70 N.E.3d 905, 912 (Mass. 2017) ("To determine whether the

language at issue is ambiguous, [the court] look[s] both to the contested language and to the text

of the contract as a whole.").  The phrase in dispute is used in the contract as follows:

> the Required Balance shall equal the <u>incurred ratable losses</u>
> developed using the development factors below subject to the
> deductible aggregate or maximum (if applicable) minus the paid
> ratable losses.  If the date of recalculation is not a date scheduled
> below, the loss development factor listed for the next scheduled
> recalculation date following the date of recalculation will be used
> to develop <u>incurred ratable losses</u>.

Pledge Agreement § 8 (emphasis added).  The agreement further defines the term "ratable

losses" as: "allocated loss adjustment expenses and all loss amounts [Plaintiff] pays pursuant to

the terms of the Insurance Policies plus all amounts that [Plaintiff], in its sole and absolute

discretion, estimates that [it] will pay for losses within the applicable 'Retention' shown in the

Large Risk Alternative Rating Option attached to the Insurance Policies." *Id.*  Defendants

correctly note that "incurred ratable losses," like "paid ratable losses," ought to be interpreted as

a subset of "ratable losses," because "incurred" modifies that phrase.  *See* Df. Opp. at 15-16.

However, the phrase "ratable losses" is broad; it permits Plaintiff to exercise its discretion to

make an estimate of what it will pay for losses.  *See* Pledge Agreement § 8.  The word "incurred"

sets some restriction on that estimate, but not the restriction Defendants propose.

Generally, "incur" means either to "become liable or subject to," or "to suffer or bring

down on oneself."  *See* "Incur," Merriam-Webster.com Dictionary (https://www.merriam-

webster.com/dictionary/incur) (last visited Sept. 15, 2023); "Incur," Black's Law Dictionary

(11th ed. 2019).  This definition suggests more than merely an estimate, but some knowledge

about the claim on the part of Plaintiff such that Plaintiff (or Defendants, the insured) is "subject

to" that loss.  Defendants ask the Court to read into this definition (based likely on the use of the

word "liable" in the definition) that "incurred" requires the loss to be established with specificity

or finality.  *See* Df. Opp. at 16-17.  However, it does not follow from the definition of "incur"

that losses must be established with some level of finality, or that Defendants must be

definitively liable for that loss – otherwise the definition would not also encompass being

"subject to" in addition to being "liable" for a loss.  The Court agrees with Plaintiff's contention

that "incurred," at least in the Pledge Agreement, means only that a loss occurred and the claim

was reported to Plaintiff, even if there has not yet been a final determination as to liability.  *See*

Pl. Reply at 2-3.  This interpretation is consistent with the definition of "incur," in that, once a

claim has been reported to Plaintiff, and the events underlying it have happened, Defendants and

Plaintiff are "subject to" that claim unless and until there is a finding of no liability.

     This construction is also consistent with the rest of the Pledge Agreement and the

agreement's unambiguous purpose.  *See Jasty v. Wright Med. Tech., Inc.*, 528 F.3d 28, 35 (1st

Cir. 2008) (concluding that, under Massachusetts law, "individual contract provisions" should

not be read in "isolation," and that term was "unambiguous" when read with the rest of the

contract).  The Pledge Agreement provides, on its face, that in order "[t]o secure the Obligations,

whether now existing or hereafter arising, . . . in connection with the Insurance Policies, . . .

Policyholder hereby pledges to and grants a security interest to Liberty Mutual" in the

policyholder's money and property (and their proceeds) "which is now in or which shall

hereafter come into the possession, custody or control" of Plaintiff, "including but not limited to

cash reflected by a bookkeeping entry maintained by" Plaintiff, which is called the "Pre-Funded Deductible Program."  Pledge Agreement § 6.  Simply put, Defendants agreed to provide collateral security for its obligations under the insurance policies in the Pre-Funded Deductible Program.  That Program contained a Required Balance, which Plaintiff had the right to amend at times in its sole discretion.  *Id.* § 7.  When Plaintiff recalculated the Required Balance, as necessary, Defendants were required to add cash to the Program.  *See id.*  Accordingly, the clear goal of the Agreement was for Defendants to place sufficient collateral security in the Program so as to "pre-fund" its obligations under the insurance policies.  This amount was not limited to the initial amount of $16,500,000, as the Agreement provides that Plaintiff could recalculate the Required Balance, possibly triggering Defendants' obligation to add cash collateral to the Program.  Plaintiff's proposed definition is therefore consistent with this purpose; when and if additional claims are reported to Plaintiff, Plaintiff may recalculate the Required Balance and, if the balance of the Program is below that balance, Defendants will need to supply additional cash collateral.

Defendants' definition is inconsistent with this clear purpose.  Under their view, the Required Balance would change only when a claim has been adjudicated, such that it is established with finality.  But by that point, any additional cash they supply to Plaintiff would no longer be "pre-funded" or collateral security; it would be a payment on a claim.  This argument contradicts the entire purpose of the Agreement.  *See Ebenisterie Beaubois LTEE v. Deiulis Bros. Const. Co.*, 18 N.E.3d 1135 (Mass. App. Ct. 2014) (rejecting interpretation of a contract that was inconsistent with obligations under the contract).

The Financial Terms and Conditions provide further support for Plaintiff's interpretation. Under Massachusetts law, when one transaction is structured or effectuated through multiple

contracts, the contracts should be read together to construe their meaning and the parties' intent. *See Dukes Bridge LLC v. Beinhocker*, 856 F.3d 186, 190 (1st Cir. 2017) (collecting cases). The parties entered into these agreements around the same time. *See* Df. 56.1 Counter ¶¶ 35, 47; Financial Terms & Conditions at 1 (noting that policy period begins August 25, 2014). Indeed, the Pledge Agreement contemplates the issuance of the Financial Terms and Conditions. In Appendix A to the Pledge Agreement, the parties agreed that, "[i]n the event of a conflict between the terms set forth in the Financial Terms and Conditions executed by Policyholder and those set forth in this Agreement[,] the terms set forth in this Agreement shall prevail." Pledge Agreement, App. A at 11. Both documents set forth the terms and obligations of the parties as to their insurance agreement. The Court therefore reads the contracts together, noting that, if their terms conflict, the terms of the Pledge Agreement prevail.

The Financial Terms and Conditions state that "[t]o secure deductible loss reimbursement and/or premium payment and all other financial obligations arising under the policy you must advance cash funds to be held by" Plaintiff. Financial Terms & Conditions at 2. It goes on to say that "[t]he amount of funding required for participation in the Pre-Funded Deductible Program is calculated using the estimated unpaid claims which are your responsibility," and that the required balance in the Program may be adjusted and amended at certain times. *Id.* The required balance, it says, "will be equal to the Incurred Ratable Losses multiplied by the Loss Development Factor, minus the Paid Ratable Losses." *Id.* These terms are consistent with the Pledge Agreement, and do not conflict, as Defendants argue. In fact, they support Plaintiff's interpretation, by stating that the funding of the Program was to be based, in part, on "estimated unpaid claims." It is reasonable, based on the purpose of the Agreement, that the reported claims – a subset of estimated claims – would therefore be accounted for in the Required Balance.

Defendants have not demonstrated an ambiguity in these terms, requiring the Court to

consider extrinsic evidence.  Indeed, Defendants object to an argument that was not even made

by Plaintiff: that "incurred ratable losses" include *all* estimates of unpaid claims or future losses.

*See* Df. Opp. at 7, 14, 17-19.  But as discussed, Plaintiff has made clear that "incurred ratable

losses" are not just estimates of future losses, but only estimates of claims *reported* to Plaintiff. [7]

Defendants have not provided an alternative meaning that is consistent with the rest of the

contract terms, and therefore have not shown the provision to be ambiguous.  *See Minturn*, 64

F.4th at 15-21 (concluding that the contract term was unambiguous in light of the rest of the

contract); *see also Blackie v. Maine*, 75 F.3d 716, 722 (1st Cir. 1996) (holding that the

contractual provision, though "not a model of syntax," was nonetheless unambiguous because

when "[r]ead as a whole, the [provision] can sustain only one reasonable interpretation").

Therefore, the Court concludes that the Pledge Agreement unambiguously provides that

"incurred ratable losses" include reserves for claims reported to Plaintiff. [8]  Because this

---

[7] Defendants do not address Plaintiff's actual argument that claims *reported to* Plaintiff are
included in the definition of incurred ratable losses.  And, as Plaintiff points out, Defendants'
own expert appeared to be fighting this strawman argument, to the point where her own opinion
became consistent with Plaintiff's view that "incurred ratable losses" are "outstanding losses" for
claims reported to the insurance company.  *See* ECF No. 124-2 ("Report of Winifred A. Baker")
at 3 (opining that "incurred ratable losses" include "paid losses, allocated loss adjustment
expenses and *outstanding losses* and do not include estimated losses (estimates), [or] reserves"
which she defined as "an estimate of what will be paid for claims" (emphasis added)); *see also*
ECF No. 116-9 ("Transcript of Baker Deposition") at 17:19-19:8 (discussing how, when a claim
is reported to an insurance company, the company posts an "outstanding loss" for it).

[8] Defendants argue that, in the insurance context, Massachusetts law requires the Court to
construe any ambiguities in the contract in favor of the insured.  *See* Df. Opp. at 12.  Importantly,
however, that case law applies to insurance *policies*, which the Pledge Agreement is not.  *See*
*Utica Mut. Ins. Co. v. Herbert H. Landy Ins. Agency, Inc.*, 820 F.3d 36, 42 (1st Cir. 2016)
("When confronting ambiguous language, we construe the *policy* in favor of the insured and
against the drafter, who is invariably the insurer, unless specific policy language is controlled by
statute or prescribed by another authority." (emphasis added) (internal citation omitted)); *U.S.*
*Liab. Ins. Co. v. Benchmark Const. Servs., Inc.*, 797 F.3d 116, 119-20 (1st Cir. 2015) (noting that

definition is consistent with Plaintiff's interpretation of the contract, the only element of Plaintiff's claim that Defendants dispute, the Court concludes that, as a matter of law, Plaintiff is entitled to specific performance of the Pledge Agreement, requiring Defendants to deposit additional funding to bring the cash collateral up to $14,228,948.91.  Df. Counter 56.1 ¶ 74.[9]

### III. Counterclaim for Breach of Contract

Defendants' counterclaim asserts that Plaintiff breached the Pledge Agreement when it recalculated the Required Balance by including "reserves" in its definition of "incurred ratable losses."  *See* Df. Opp. at 23-24.  Defendants' argument as to why their counterclaim should proceed past summary judgment is the same argument that the Court has rejected with respect to the interpretation of "incurred ratable losses."  *See id.*  In their papers, Defendants have not articulated any other grounds for a breach by Plaintiff.  *See Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004) (noting that a party who does not "raise [an] argument in his opposition to summary judgment" waives that argument); *Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*, 483 F. Supp. 3d 195, 206 n.6 (S.D.N.Y. 2020) ("Arguments not raised in a party's brief are deemed waived.").  Accordingly, the counterclaim is dismissed.

---

when interpreting an insurance policy under Massachusetts law, "[a]mbiguities are to be construed against the insurer and in favor of the insured," especially when interpreting policy exclusions).  Regardless, the Court does not find the Pledge Agreement ambiguous and therefore this principle does not come into play.  *See supra* at Discussion § II.

[9] At the time of the filing of the Complaint, on August 6, 2021, the Required Balance was $16,963,132.  *See* Compl. at 15. During the course of the litigation, however, the parties agree that Plaintiff issued a revised schedule, adjusting the Required Balance to $14,228,948.91.  *See* Df. 56.1 Counter ¶ 74.  Defendants do not object to the revised Required Balance, or its calculation, except with respect to the definition of incurred ratable losses, an argument that the Court has rejected.  To the extent Defendants otherwise object to the Required Balance, that dispute is not before this Court.

**IV. Attorneys' Fees**

Plaintiff argues that it is entitled to attorneys' fees under the terms of the Pledge

Agreement.  *See* Pl. Br. at 22-23.  Defendants do not address this argument in their papers.  *See*

*generally* Df. Opp.  Accordingly, the Court will consider an application for attorneys' fees from

Plaintiff before entering final judgment.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED and

Defendants' motion for summary judgment is DENIED.  Defendant is ordered to deposit

additional cash collateral into the Pre-Funded Deductible Program to bring the cash collateral

balance up to the Required Balance of $14,228,948.91.

Plaintiff shall make an application for attorneys' fees forthwith, but no later than **two**

**weeks** after the date of this Opinion and Order.  Defendants' opposition, if any, shall be filed no

later than **two weeks** after service of the application, and Plaintiff's reply shall be filed no later

than **one week** after service of the opposition.

The Clerk of Court is respectfully directed to terminate the motions pending at ECF

Nos. 111 and 117.

Dated:  September 20, 2023
New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge

24